UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

BARBARA ANN HALL,

                    Plaintiff,

      -against-                         1:15-CV-01189 (LEK/ATB)

CAROLYN W. COLVIN,
Commissioner of Social Security

                  Defendant.

_____

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

This case has proceeded in accordance with General Order 18, which establishes the

procedures applicable to appeals from denials of Social Security benefits. Both parties have filed

briefs. Dkt. Nos. 9 ("Plaintiff's Brief"), 10 ("Defendant's Brief"). For the following reasons, the

decision of the Social Security Administration ("SSA") is vacated and this case is remanded for

further proceedings.

## II. BACKGROUND

### A. The Disability Allegations

Plaintiff Barbara Ann Hall was born on September 1, 1972. Dkt. No. 8 ("Record") at 146.

As of June 4, 2014, when the administrative hearing was held, id. at 31, Hall was living in

Clifton Park, New York, with her adult daughter, id. at 34–36. A little over a year after the

hearing, Hall reported that she had been homeless for about a year "due to domestic violence."

Id. at 7. Soon thereafter, Hall's attorney stated that Hall was now staying with her sister's family.

Id. at 5. Hall claims that she suffers from several physical and mental ailments, including

"chronic and debilitating pain in her abdomen, back, legs, feet, and wrists" resulting from two surgeries she underwent, and "anxiety and depression." Dkt. No. 1 ("Complaint") ¶ 17. Hall argues that these conditions render her disabled, with a disability onset date of May 7, 2012. R. at 15.

Hall has a tenth-grade education, id. at 185, 428, and she never got her GED, id. at 35. She attended special education classes from 1980 to 1988. Id. at 185. Hall has not worked since July 2010, when she was laid off from her position as a bus driver, which she had held since 2003. Id. at 186. According to Hall, she was fired because of "lack of work." Id. at 36. From 1997 to 2003, Hall held various jobs, including cafeteria worker, cashier, and sales associate. Id. at 79–80, 186. Hall claims that her alleged disabilities have prevented her from working since May 7, 2012, id. at 184, although at the administrative hearing, neither she nor her lawyer was able to give a definitive explanation as to why she chose that particular date, id. at 47–48. Hall can perform certain basic tasks, including doing the dishes and laundry, going grocery shopping, and walking short distances, but she often requires assistance. Id. at 195–99.

This appeal concerns Hall's physical and mental health impairments. In particular, Hall alleges that she has depression and anxiety, which prevent her from engaging in gainful employment, Pl.'s Br. at 6–7, and that her physical impairments, which resulted from a partial hysterectomy and a mastectomy she underwent, cause her severe pain that also renders her unable to work, Compl. ¶¶ 16–21. The Court now turns to the records related to these conditions.

   1. *Anxiety and Depression*

On January 9, 2013, Dr. Neil Berger performed a consultative psychiatric evaluation on Hall. R. at 428. According to Dr. Berger, Hall claimed to have been suffering from depression

and anxiety for the past sixteen years. Id. at 429. She had had thoughts of suicide in the past, but they had stopped years ago. Id. She had a "sense of hopelessness at times, a great deal of lethargy and lack of energy, a diminished self esteem, diminished sense of pleasure, and [was] withdrawn socially." Id. Hall also had "ongoing anxiety and restlessness," though she did not report any panic attacks and there was "no evidence of thought disorder or manic symptoms." Id. Dr. Berger's mental status examination of Hall revealed that she made appropriate eye contact, was capable of clear and fluent speech, had "coherent and goal directed" thought processes, and was oriented times three. Id. at 429–30. On the other hand, Dr. Berger found that she had an anxious affect and that her anxiety appeared to be interfering with her ability to perform counting and calculation tasks designed to test her attention and concentration. Id. at 430. Similarly, her anxiety and depression appeared to impair her memory skills. Id. Dr. Berger wrote that Hall "has trouble relating adequately with others and dealing with stress because of her fatigue, lack of motivation, some level of distractibility and possible cognitive deficits." Id. at 431. He summed up the examination by saying that its results "appear to be consistent with psychiatric problems [including bipolar disorder and anxiety disorder], and this may significantly interfere with the claimant's ability to function on a daily basis." Id.

On January 23, 2013, Dr. Howard Ferrin performed a psychological evaluation of Hall, finding that she was "able to understand and remember instructions and sustain attention and concentration for tasks." Id. at 79. Dr. Ferrin also noted that Hall "may benefit from an environment where she is precluded from intensive interaction with the public," and that she "may have some difficulty with adaptation but appears able to cope with basic changes and to make routine decisions." Id.

3

On December 4, 2013, Jennifer Cole, a licensed social worker who had been seeing Hall on a biweekly basis for at least a couple of months, filled out a functional capacity questionnaire for purposes of assisting the SSA in determining whether Hall is disabled. Id. at 443–47. Cole, who was affiliated with Vitality Physicians Group, was Hall's primary mental health care provider for the period in which she saw her. Id. at 38.[1] In the questionnaire, Cole stated that Hall had major depressive disorder and generalized anxiety disorder. Id. at 443. Contrary to Dr. Berger's examination, Cole reported that Hall had "expressed some suicidal ideation stemming from depressive symptoms and lack of support network." Id. According to Cole, Hall also reported having "severe panic attacks (scaled 9/10) that prevent her from engaging in social/ community/job activities that are meaningful." Id. As a result of the medications she was taking, which included fluoxetine, Cymbalta, and Klonopin, Hall typically slept twelve to fourteen hours a day. Id. at 443–44. After describing the prognosis for Hall's depression and anxiety as "bleak," id. at 444, Cole stated that Hall experienced "marked limitation" in the activities of daily living and in maintaining social functioning and concentration, persistence, and pace, id. at 445. Cole also noted that Hall continually experienced "[e]pisodes of deterioration or decompensation that cause the patient to withdraw from [a] situation." Id. at 446. Hall's anxiety made her "completely unable to function outside . . . the home," and she was likely to miss more than four days of work per month as a result of her psychological impairments. Id. Further, Cole suggested that Hall was severely limited in her ability to deal with standard work pressures and to complete complicated tasks on a regular basis in a full-time work environment. Id. at 447. Finally, Hall's psychological

_____

[1] From 1999 to 2008, Hall received "psychiatric treatment from Dr. Bermuda." R. at 444. From 2008 to 2013, when she began seeing Cole, she saw "Barbara Henderer" for psychotherapy. Id. at 448–61.

4

ailments meant that she was markedly limited in, among other things, her ability to carry out simple tasks in a full-time work setting. Id.

At the hearing, Hall testified that she usually woke up at 11:00 AM, though sometimes she slept all day. Id. at 40. She spent her days doing chores around the house, watching television, and occasionally going to the grocery store. Id. at 41–42. She did not "really socialize with anybody." Id. at 43. She testified to having dealt with depression "since high school, middle school," and she stated that she experienced its symptoms three or four times a week. Id. at 45. These symptoms included "racing of the heart, [feeling] very sad, tired, everything." Id. Her depression caused her energy level to be very low, and it made it hard for her to concentrate on anything. Id. at 45–46. Hall testified that she had struggled with suicidal thoughts, though she said that she had never been hospitalized for her depression. Id. at 46. Hall also described her anxiety, which she experienced three or four times a week. Id. at 47. Her anxiety would often manifest itself when she woke up in the morning, and when that happened, its effects would last the entire day. Id. She also experienced anxiety when "[s]omebody would say something the wrong way or do something the wrong way," id., and when she was in crowds of ten or more people, id. at 48–49. She testified to having had episodes of anxiety and depression during previous jobs, which often caused her to miss work. Id. at 51–52.

*2. Physical Ailments and Pain*

In February 2009, Hall underwent a partial hysterectomy, and since then she "has had an alternating bowel pattern between diarrhea and constipation." Id. at 292. Further, she has experienced "some low abdominal discomfort" related to her bowel pattern. Id. Hall's mother,

who was diagnosed with recurrent breast cancer, carried a BRCA gene mutation,[2] and as a result of that, Hall went in for testing. Id. at 334. When it was discovered that Hall carried a "BRCA 1 mutation of uncertain significance . . . and BRCA deleterious mutation," id., her doctors at Women's Cancer Care Associates recommended that she undergo a laparoscopic bilateral salpingo-ophorectomy—a procedure for removing a patient's ovaries and fallopian tubes—and a bilateral mastectomy, id. at 300–08. On October 12, 2012, Hall had the laparoscopic bilateral salpingo-ophorectomy, during which it was observed that she had "extensive adhesions of the sigmoid colon to [the] left pelvic sidewall and pelvic floor." Id. at 343. On October 23, 2012, she had the bilateral mastectomy. Id. at 542. After the mastectomy, Hall was admitted to the emergency room at the Albany Medical Center with complaints of nausea and vomiting. Id. At the hospital, she was diagnosed with gastroenteritis and discharged after three days. Id. at 553, 558.

Hall attended a post-operation follow-up on December 5, 2012, where she reported that she was experiencing lower back pain, constipation, and abdominal bloating. Id. at 539. However, Dr. Patrick F. Timmins, who treated her that day, noted that she seemed "90%-Able to carry on normal activity," id., and the physical examination failed to reveal any serious issues, id. at 540–41. Later that month, Hall had another follow-up, this time with Dr. Nita Parikh, in which she complained of, among other things, abdominal pain, diarrhea, dizziness, and pain in her right leg. Id. at 536. At a February 5, 2013, examination conducted by Dr. Xinjun Cindy Zhu, Hall was found to have "[g]astroesophageal reflux disease with noted reflux esophagitis." Id. at 535. Hall

---

[2] A BRCA gene mutation increases a female carrier's risk of ovarian and breast cancers. Pl.'s Br. at 8 n.10.

reported that "her anxiety and depression [were] more active now," which was significant because the doctor found that these issues "might . . . be playing a role" in the reflux disease. Id. Dr. Valerie Brutus examined Hall on May 8, 2013, and she performed an examination that revealed no notable physical problems, though Hall did "report intermittent pain bilaterally [in the breast region]." Id. at 532–33.

On July 11, 2013, Hall saw Dr. Parikh again to follow up on the surgeries and to address stomach issues and a rash under her left arm. Id. at 522–24. Hall told Dr. Parikh that she had been experiencing pain in her lower abdominal area since 2009, and that the 2012 surgeries contributed to the pain. Id. at 523. Despite these recurring problems, on July 24, 2013, Dr. Brian T. Valerian, who saw Hall that day, described her as recovering well from her surgeries, id. at 519, though she did complain of "fecal incontinence" and "rectal pain with the bowel movements," id. at 520. On September 13, 2013, Hall again complained of "persistent abdominal discomfort," id. at 515, and on November 5, 2013, she told Dr. Parikh that she was experiencing "throat pain," though her physical evaluation did not suggest any issues. Id. at 512–13. The next month, Hall again referred to the throat pain she was experiencing, and Dr. Carlos Pinheiro Neto, after noting that Hall was a smoker "with a family history of throat cancer," stated that he had failed to find any problems related to the pain during the physical examination. Id. at 501. Hall's next (and last) recorded non-psychiatric medical appointment took place on May 14, 2014. Id. at 497. Dr. Parikh's assessment for that appointment mentioned Hall's abdominal pain and bloating, though again the physical examination did not turn up any problems. Id. at 497–500.

At the hearing, Hall testified that she experienced pain in the lower abdominal area. Id. at 49. She said that it wrapped around her back and had spread to her feet. Id. She claimed that

her doctors told her that the pain resulted from her hysterectomy. Id. Further, she testified that she experienced back pain every day and abdominal pain around three times a week. Id. at 50. Her pain prevented her from walking for extended periods of time, though she could not specify how long she could walk before experiencing pain. Id. She also claimed that she could not lift objects heavier than four pounds. Id. Finally, she testified that she had no difficulty standing or sitting. Id. at 52.

**B. Procedural History and the SSA's Decision**

Hall applied for disability benefits and supplemental security income on September 18, 2012. Id. at 15. The application was denied on February 5, 2013, and Hall requested a hearing before an administrative law judge ("ALJ") on March 25, 2013. Id. Hall appeared and testified at the hearing, which was held before ALJ Wright on June 4, 2014. Id. at 31–32. At the hearing, ALJ Wright and Hall's attorney asked her questions about her medical conditions, ability to function, and employment history. Id. at 34–54.

ALJ Wright and Hall's attorney then questioned Cherie Plante, a vocational expert, about the employment prospects of someone with Hall's limitations. Id. at 54–58. The ALJ presented Plante with the following hypothetical: "Let me provide you with a Residual Functional Capacity. Limited to unskilled work, which is simple, routine and low stress, defined as having only occasional decision making, changes in work setting and only occasional interaction with coworkers and no interaction with the public." Id. at 55. Plante said that there were jobs in the national economy that someone with Hall's limitations could perform. Id. at 56–57. ALJ Wright then presented Plante with another hypothetical, in which the hypothetical individual has the same limitations as the previous individual, but she "would be absent from work more than four

days a week." Id. at 57. Plante testified that there would be no unskilled occupations that someone with that profile could perform. Id. Hall's attorney then asked Plante for her opinion about how many days per month someone can typically miss without losing her job. Id. Plante replied that "on the average . . . an unscheduled day missed out of work more than once a month would probably not be tolerated." Id.

On July 3, 2014, ALJ Wright issued a decision finding that Hall was not disabled under the Social Security Act. Id. at 12–25. Progressing through the five-step process for determining disability under SSA regulations (discussed below in Part III.B), ALJ Wright first found that Hall was not currently engaged in gainful employment, a threshold question for determining disability. Id. at 17. Next, ALJ Wright found that Hall had two severe impairments: affective disorder and anxiety disorder. Id. However, ALJ Wright found that Hall had no "musculoskeletal impairment," and that Hall's "abdominal pain and reflux [were] nonsevere." Id. at 19. ALJ Wright based this determination on the lack of evidence from Hall's physical examinations corroborating her alleged physical impairments. Id. He also pointed out that "[m]uch of the evidence [for Hall's physical impairments and pain] was based on [her] subjective reports, which are less than fully credible in light of benign examinations, [her] noncompliance with diet, and [her] weak treatment history with no emergency visits in between regularly scheduled check-ups." Id.

Moving on to the next step, ALJ Wright found that Hall's mental impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. pt. 404(P), app. 1. Id. He then determined that Hall had the residual functional capacity ("RFC") to "perform a full range of work at all exertional levels but with the following nonexertional limitations: she

can perform unskilled work that is simple, routine, and low stress, . . . [with] only occasional decision making, changes in work setting or interaction with coworkers, and no interaction with the public." Id. at 20. Notably for this appeal, in making this finding, ALJ Wright explicitly considered only Hall's mental limitations. Id. at 20–23. ALJ Wright acknowledged Hall's anxiety and her difficulties with concentration stemming from her depression, but he gave great weight to treatment notes from Dr. Berger and Dr. Ferrin indicating that despite her psychological limitations, she was generally capable of performing simple, unskilled work. Id. at 23. ALJ Wright gave little weight to Jennifer Cole's report. Id. at 22. ALJ Wright appeared to argue that Cole's report was internally inconsistent, since it found marked limitations in daily activities and social functioning yet noted that Hall had normal affect and could remember items and do serial sevens. Id. at 22–23. ALJ Wright also found a discrepancy between Cole's statement that Hall had attended therapy from 2008 to 2013 and the fact that Hall apparently went to only six sessions. Id. at 23. Further, according to ALJ Wright, Cole had not performed a mental status evaluation on Hall prior to the report. Id. at 22. ALJ Wright then determined that Hall could not perform any past relevant work. Id. at 24. Finally, based on the vocational expert's opinion that a person with Hall's limitations would be able to find work in the national economy, ALJ Wright found that Hall was not disabled under the Social Security Act. Id. at 24–25.

Following ALJ Wright's decision, Hall sought review of her case by the SSA's Appeals Council. Id. at 10. On August 4, 2015, however, the Appeals Council denied Hall's request for review. Id. at 1.

### C.  This Appeal

On October 5, 2015, Hall initiated this appeal by filing her Complaint. In her brief, she makes three arguments as to why ALJ Wright erred in finding that she was not disabled. First, she argues that ALJ Wright erred in giving little weight to Jennifer Cole's assessment of Hall's psychological impairments. Pl.'s Br. at 12. Hall argues that ALJ Wright should have treated Cole, a licensed social worker, as an "acceptable medical source" under 20 C.F.R. § 404.1513. Id. at 13. In the alternative, Hall argues that ALJ Wright mischaracterized the duration of the relationship between Hall and Cole, in addition to finding inconsistencies regarding Hall's anxiety that did not in fact exist. Id. at 13–16. Second, Hall argues that ALJ Wright erred in finding that Hall's pain and physical impairments were not severe. Id. at 16–17. Third, Hall claims that, in determining Hall's RFC, ALJ Wright failed to "treat [her] complaints of back and abdominal pain as severe and . . . fail[ed] to consider the limiting effect pain has on her functioning." Id. at 20. Each of these arguments is addressed below.

## III.  LEGAL STANDARD

### A.  Standard of Review

When a court reviews a final decision by the SSA, it determines whether the ALJ applied the correct legal standards and whether the decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)). Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision maker's conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The Court defers to the ALJ's decision if it is supported by substantial

evidence, "even if [the Court] might justifiably have reached a different result upon a de novo review." Sixberry v. Colvin, No. 12–CV–1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). The Court should not uphold the ALJ's decision when there is substantial evidence, but it is not clear that the ALJ applied the correct legal standards. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987). However, remand is unnecessary "where application of the correct legal principles to the record could lead to only one conclusion." Id. The Court may not "affirm an administrative action on grounds different from those considered by the agency." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (citing SEC v. Chenery Corp., 332 U.S. 194 (1947)).

### B. Standard for Benefits

According to SSA regulations, disability is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). However, an individual seeking disability benefits "need not be completely helpless or unable to function." De Leon v. Sec'y of Health & Human Servs., 734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Educ. & Welfare, 463 F.2d 38, 41 n.6 (2d Cir. 1972)).

In order to receive disability benefits, a claimant must satisfy the requirements set forth in the SSA's five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(1). In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)). If the SSA is able to determine that the claimant is disabled or not disabled at any step,

the evaluation ends. 20 C.F.R. § 404.1520(a)(4). Otherwise, the SSA will proceed to the next step. Id.

At step one, the SSA considers the claimant's current work activity to see if it amounts to "substantial gainful activity." Id. § 404.1520(a)(4)(i). If it does, the claimant is not disabled under SSA standards. Id. At step two, the SSA considers whether the claimant has a severe and medically determinable physical or mental impairment—or a combination of impairments that is severe—that meets the duration requirement in 20 C.F.R. § 404.1509. Id. § 404.1520(a)(4)(ii). If he or she does not have such an impairment, the claimant is not disabled under SSA standards. Id. At step three, the SSA considers the severity of the claimant's medically determinable physical or mental impairment(s) to see if it meets or equals an impairment and the requisite duration listed in 20 C.F.R. pt. 404(P), app. 1. Id. § 404.1520(a)(4)(iii). If it meets one of these listed impairments and durations, the claimant is disabled.

If, following step three, no disability determination has been made, the SSA must determine the claimant's RFC, meaning the most work the claimant is able to do given her impairments and other limitations. Id. §§ 404.1520(e), 404.1545. Then, under step four, the claimant is not disabled if the RFC reveals that the claimant can perform her past relevant work. Id. § 404.1520(a)(4)(iv). If the claimant cannot perform any past relevant work, the SSA decides at step five whether adjustments can be made to allow the claimant to work somewhere in a different capacity. Id. § 404.1520(a)(4)(v). If appropriate work does not exist, then the SSA considers the claimant to be disabled. Id.

## IV. DISCUSSION

### A. Jennifer Cole's Assessment of Hall

As mentioned above, Hall argues that ALJ Wright erred in failing to treat Jennifer Cole, a licensed social worker with a doctorate in social work, as an "acceptable medical source" under 20 C.F.R. § 404.1513. Pl.'s Br. at 12. Hall also claims that, even if Cole cannot be considered an acceptable medical source, ALJ Wright should not have given Cole's assessment little weight, since Cole saw Hall on a regular basis as her primary treating source for psychological issues. Id. at 13.

Under the "treating physician rule," "courts give the opinions of treating physicians and other 'acceptable medical sources' controlling weight as long as they are 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with' other substantial evidence in the record." Wiggins v. Colvin, No. 13-CV-1181, 2015 WL 5050144, at *2 (D. Conn. Aug. 25, 2015) (quoting Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008)). "Acceptable medical sources" include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech pathologists. 20 C.F.R. § 404.1513(a). Other sources may provide insight into the severity of an impairment and how it affects a claimant's ability to work. Id. § 404.1513(d). However, these other sources "do not enjoy a controlling weight presumption." Orts v. Astrue, No. 11-CV-512, 2012 WL 6803588, at *5 (N.D.N.Y. Nov. 14, 2012) (quoting Monger v. Heckler, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983)), adopted by 2013 WL 85071 (N.D.N.Y. Jan. 7, 2013) (Kahn, J.).

Contrary to Hall's assertion that Cole, as a licensed social worker, should be classified as an acceptable medical source, it is well established that licensed social workers fall under the

category of other sources. See, e.g., Gonzalez v. Colvin, No. 15-CV-6123, 2016 WL 4009532, at

*4 (W.D.N.Y. July 27, 2016) ("[C]linical social workers are considered 'other sources' within

the meaning of 20 C.F.R. §§ 404.1513(d) and 416.913(d)."); Genovese v. Astrue, No.

11-CV-2054, 2012 WL 4960355, at *14 (E.D.N.Y. Oct. 17, 2012) (describing licensed social

workers as "other sources"). The SSA has issued a Social Security Ruling ("SSR") that explicitly

includes "licensed clinical social workers" among other sources. SSR 06-03p, 2006 WL

2329939, at *2 (Aug. 9, 2006). Given this authority, there is no merit to Hall's contention that

licensed social workers should be considered acceptable medical sources rather than other

sources. The only question is whether, treating Cole as an other source, ALJ Wright erred in

giving her assessment of Hall little weight.

Assessments offered by other sources are "important and should be evaluated on key

issues such as impairment severity and functional effects." Anderson v. Astrue, No. 07-CV-4969,

2009 WL 2824584, at *9 (E.D.N.Y. Aug. 28, 2009) (citing SSR 06-03p, 2006 WL 2329939, at

*3). A report made by a social worker deserves particular weight where the social worker is the

"sole source that had a regular treatment relationship with plaintiff." White v. Comm'r of Soc.

Sec., 302 F. Supp. 2d 170, 176 (W.D.N.Y. 2004) (citing Bergman v. Sullivan, No. 88-CV-513L,

1989 WL 280264, at *3 (W.D.N.Y. Aug. 7, 1989)). However, "the ALJ has discretion to

determine the appropriate weight to accord the [social worker's] opinion based on all the

evidence before him." Diaz v. Shalala, 59 F.3d 307, 313–14 (2d Cir. 1995); see also Genovese,

2012 WL 4960355, at *15 ("An ALJ is not required to give controlling weight to a social

worker's opinion; although he is not entitled to disregard it altogether, he may use his discretion

to determine the appropriate weight."); Philpot v. Colvin, No. 12-CV-291, 2014 WL 1312147, at

*5 (N.D.N.Y. Mar. 31, 2014) (finding that it was within the ALJ's discretion to reject a report offered by a treating social worker where the ALJ "found it to be outweighed by the rest of the evidence"). In evaluating evidence from other sources, including licensed clinical social workers, the ALJ should consider the following factors:

> [h]ow long the source has known and how frequently the source has seen the individual; [h]ow consistent the opinion is with other evidence; [t]he degree to which the source presents relevant evidence to support an opinion; [h]ow well the source explains the opinion; [w]hether the source has a specialty or area of expertise related to the individual's impairment(s); and [a]ny other factors that tend to support or refute the opinion.

SSR 06-03p, 2006 WL 2329939, at *4–5. The ALJ "should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning." Id. at *6.

The Court finds that ALJ Wright committed legal error in failing to adequately explain his decision to give little weight to Cole's assessment. ALJ Wright attempted to cast doubt on the duration of the treating relationship by noting that Hall told "a consultative examiner that her treatment [with Cole] did not even begin until January 2013, after . . . Cole's assessment is dated." R. at 22–23. However, as ALJ Wright himself acknowledged in the same paragraph, Cole's assessment is dated December 4, 2013. Id. at 22, 443. Thus, according to the evidence in the record cited by ALJ Wright, Cole's treatment of Hall began eleven months *before* Cole made her assessment. The Court notes that it is not clear from the record when exactly Hall began seeing Cole. At the hearing, Hall testified that she had been seeing Cole since June 2013. Id. at 38–39. In a May 19, 2014, report signed by Dr. Varinder Rathole, who was affiliated with

16

Vitality Physicians Group (Cole's employer), there is an entry stating that as of "10/7[/2013]," Hall was "going to Jen for therapy." Id. at 573. At the very least, then, Hall had been seeing Cole on a biweekly basis for a little less than two months before Cole offered her assessment of Hall's psychiatric state. Although it is not completely clear from ALJ Wright's decision, it appears that he based his conclusion that treatment with Cole was designed to "develop a disability claim" at least in part on his assessment of the duration of the treating relationship. Id. at 23. This assessment is not supported by the evidence in the record.

ALJ Wright also asserted that Cole's assessment of Hall's functional limitations "appears to be based primarily on the claimant's subjective reports, as she has no treatment notes prior to that date and had yet to have a mental status evaluation by this provider." Id. at 22. To the extent that ALJ Wright was suggesting Hall did not have a treatment relationship with Cole before the assessment, this is belied by the evidence of a months-long treatment relationship discussed above. Moreover, the December 4, 2013, assessment performed by Cole describes a "mental status examination," which apparently found that Hall's mood was "anxious." Id. at 443. Cole had therefore performed at least one mental status evaluation by the time she made her assessment. True, there are no treatment notes made by Cole before the December 4, 2013, assessment. But as just discussed, there is evidence in the record that Cole had been seeing Hall on a bi-weekly basis for at least two months, and at most eleven months, before the assessment. Thus, ALJ Wright's characterization of the treatment relationship between Hall and Cole is not supported by the evidence in the record.

ALJ Wright found an inconsistency between Cole's assertion that Hall suffered from anxiety issues and other "treatment notes[, which] do not even reference an anxiety disorder." Id.

at 22. ALJ Wright also wrote that "[g]iven [Hall's] severe allegations of anxiety at hearing and in adult function report, one wonders why treatment notes have no diagnosed anxiety disorder." Id. at 23. This alleged inconsistency simply does not exist. Treatment notes made by Dr. Rathole and dated April 7, 2014, include a diagnosis of "Generalized Anxiety Disorder." Id. at 570. The same is true of treatment notes dated May 19, 2014. Id. at 572. These two sets of treatment notes also state that Hall will undergo sixty-minute therapy sessions as part of a treatment plan for her anxiety disorder. Id. at 571, 573. Moreover, in a follow-up performed after Hall's 2012 surgeries, "anxiety" was listed in the entry for "past medical and surgical history." Id. at 534. ALJ Wright found another inconsistency between, on the one hand, Cole's statement that Hall often slept twelve to fourteen hours a day as a result of her medication, id. at 444, and, on the other hand, the statement in later treatment notes that Hall denied any side effects from her medication, id. at 573. However, ALJ Wright failed to mention that the very same page of the treatment notes also contains the following entry: "Cymbalta . . . klonopin . . . side effects discussed." Id. This was improper. See Sutherland v. Barnhard, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004) ("It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his determination, without affording consideration to evidence supporting the plaintiff's claims. It is grounds for remand for the ALJ to ignore parts of the record that are probative of the claimant's disability claim."). Further, while ALJ Wright was entitled to examine "[h]ow consistent [Cole's] opinion is with other evidence," SSR 06-03p, 2006 WL 2329939, at *4, he should not have manufactured inconsistencies in determining the weight to be accorded to Cole's opinion. Cf. Diaz v. Chater, No. 96-CV-5676, 1997 WL 34502152, at *8 (E.D.N.Y. Aug. 4,

1997) (finding that the ALJ erred in not giving controlling weight to a treating physician's report in part because the ALJ found "inconsistency where none actually exists").

Finally, ALJ Wright appears to have suggested that Cole's assessment is internally inconsistent. R. at 23. In particular, the report states that Hall had marked limitations in the activities of daily living, social functioning, and concentration. Id. at 445. Yet the report also says that Hall was alert and oriented times three, was capable of remembering three items and performing serial sevens, and had normal affect and intact functional status. Id. at 443. This alleged inconsistency is highly misleading. Cole's report clarifies that the marked limitations just mentioned stem from "severe panic attacks . . . that prevent [Hall] from engaging in social/community/job activities that are meaningful." Id. It goes on to say that Hall "experiences severe anxiety & panic attacks in large groups of people." Id. The alleged inconsistency disappears when one realizes that Hall's panic attacks were, as Cole's report explicitly states, triggered by crowds. That aspect of Hall's anxiety makes it clear that there is nothing odd about her seeming normal and capable of performing basic tasks in a setting in which she was alone with Cole, her therapist. Thus, this basis for giving little weight to Cole's assessment is not supported by the evidence in the record.[3]

_____

[3] The Commissioner suggests that ALJ Wright's decision to afford little weight to Cole's assessment is supported by substantial evidence because of inconsistencies between the assessment and findings made by Dr. Rathmore, another employee of Vitality Physicians Group. Def.'s Br. at 10. However, ALJ Wright did not rely on this ground in justifying the weight he gave to Cole's report. Because "[t]he ALJ did not articulate this reasoning in his decision, the court cannot accept such post hoc rationalization." Gonzalez v. Astrue, No. 10-CV-2941, 2012 WL 3930412, at *7 (E.D.N.Y. Sept. 10, 2012) (citing Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999)); see also Otis v. Social Sec. Admin., Comm'r, No. 12-CV-167A, 2013 WL 2422627, at *12 (D. Vt. June 3, 2013) ("A court may not speculate as to the reasoning of an ALJ and must not engage in a post hoc effort to supplement that reasoning." (citing Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1225 (9th Cir. 2009))).

ALJ Wright committed legal error in failing to appropriately explain the reasons for the weight he accorded to Cole's report. See Langlais v. Astrue, No. 11-CV-284, 2012 WL 4513641, at *7 (D. Vt. Sept. 12, 2012) (describing the requirement that the ALJ, in evaluating evidence from other sources, give "adequate reasons for [the] decision to afford little weight" to such sources), adopted by 2012 WL 4511413 (D. Vt. Oct. 2, 2012). Moreover, given that Cole's report strongly supports a determination that Hall is disabled, it is not clear that if ALJ Wright had applied the correct legal standards, he would have made a finding of no disability. See Anderson v. Colvin, No. 12-CV-1008, 2013 WL 5939665, at *9 (N.D.N.Y. Nov. 5, 2013) (finding that the ALJ's failure to "substantially comply[] with the Commissioner's prescribed protocol for determining credibility of 'other source' opinion[s]" was not harmless error because the ALJ might have come to a different disability determination had she followed the applicable law). Thus, remand is appropriate. On remand, the Commissioner must give appropriate weight to Cole's assessment and, in accordance with the law governing the weighing of other source evidence, sufficiently explain the reasoning and evidence that lead to the weight ultimately assigned.

**B. The Severity of Hall's Pain and Physical Impairments**

Hall argues that ALJ Wright erred in finding that her pain and physical impairments were not severe. Pl.'s Br. at 16–17. In particular, Hall claims that, in making his step-two determination as to whether Hall had any severe, medically determinable impairments, ALJ Wright failed to properly consider Hall's "gastrointestinal issues, including chronic and debilitating abdominal pain, and resulting functional limitations." Id. at 16.

At the second step of the sequential evaluation process, the ALJ must decide whether the claimant has a severe impairment, defined as one that "significantly limit[s] [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). "Basic work activities which are relevant for evaluating the severity of a physical impairment include 'physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling.'" <u>Roat v. Barnhard</u>, 717 F. Supp. 2d 241, 261 (N.D.N.Y. 2010) (citing <u>id.</u> § 404.1521(b)(1)). "It is the claimant's burden to present evidence that establishes the severity of his or her impairment." <u>Collier v. Colvin</u>, No. 15-CV-230, 2016 WL 4400313, at *4 (W.D.N.Y. Aug. 17, 2016) (citing 20 C.F.R. § 416.912(c)). "A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" <u>Rosario v. Apfel</u>, No. 97-CV-5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (citing SSR 85-28, 1985 WL 56856, at *3 (Jan. 1, 1985)). The "'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, itself, sufficient to deem a condition severe." <u>McConnell v. Astrue</u>, No. 03-CV-0521, 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008) (quoting <u>Coleman v. Shalala</u>, 895 F. Supp. 50, 53 (S.D.N.Y. 1995)). If the parties disagree about the ALJ's refusal to categorize a particular impairment as severe, the court must determine "whether there was substantial evidence to support the ALJ's conclusion that [the impairment] should not be included as a 'severe impairment.'" <u>Hussain v. Comm'r of Soc. Sec.</u>, No. 13-CV-3691, 2014 WL 4230585, at *7 (S.D.N.Y. Aug. 27, 2014) (citing 42 U.S.C. § 405(g)), <u>adopted by</u> 2014 WL 5089583 (S.D.N.Y. Sept. 25, 2014).

The Court finds that ALJ Wright's decision regarding the severity of Hall's physical impairments and pain is supported by substantial evidence. While there is extensive medical evidence in the record of Hall's gastrointestinal issues, e.g., R. at 535, there is no medical evidence suggesting that these issues had any effect on Hall's "ability to do basic work activities." 20 C.F.R. § 404.1521(a). As ALJ Wright pointed out in his decision, "physical examination showed no deficits in ranges of motion, gait, strength, reflexes, or sensory [abilities]." R. at 19. The only evidence of work-related limitations comes from Hall's testimony at the hearing about her pain, which allegedly interfered with her ability to take long walks. Id. at 50. Hall also claimed that she could not lift objects heavier than four pounds. Id. However, Hall did not testify to any trouble with standing or sitting. Id. at 52.

ALJ Wright found Hall's testimony about the limiting effects of her pain to be lacking in credibility because of the unremarkable results from her physical examinations, her failure to comply with a diet recommended by one of her examiners, and her "weak treatment history with no emergency visits in between regularly scheduled check-ups." Id. at 19. The Court finds that these justifications for discounting the credibility of Hall's testimony on this point are supported by substantial evidence. For example, as discussed above, the physical examinations conducted by Hall's doctors in the aftermath of her 2012 surgeries showed generally benign results. Id. at 499, 501, 512–13, 523, 532, 539. Moreover, Dr. Timmins opined on December 5, 2012, that Hall was "90%-Able to carry on normal activity," id. at 539, a finding at odds with Hall's testimony about serious physical limitations resulting from her pain. Therefore, the ALJ appropriately determined that Hall's physical impairments and pain did not lead to a severe impairment.

## C.  The RFC Determination

Hall argues that ALJ Wright erred in determining her RFC without considering the impact pain and her physical impairments have on her ability to function. Pl.'s Br. at 20. The Court agrees with Hall.

Before moving on to step four of the sequential evaluation process, the ALJ must determine the claimant's RFC, which refers to what a claimant is capable of doing despite her limitations. 20 C.F.R. §§ 404.1520(e), 404.1545. In evaluating the effect of a claimant's symptoms on her RFC, the ALJ conducts a two-part inquiry. Kessler v. Colvin, 48 F. Supp. 3d 578, 594 (S.D.N.Y. 2014); see also SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). "First, the ALJ must determine whether medically acceptable clinical and laboratory diagnostic techniques establish an underlying physical or mental impairment that could reasonably be expected to produce the claimant's symptoms." McGann v. Colvin, No. 14-CV-1585, 2015 WL 5098107, at *10 (S.D.N.Y. Aug. 31, 2014) (citing 20 C.F.R. § 404.1529(a)–(b)). "Second, once an underlying physical or mental impairment has been shown, the ALJ must evaluate the intensity, persistence, and limiting effect of the claimant's symptoms to determine the extent to which they limit the claimant's functioning." Id. (citing 20 C.F.R. § 404.1529(c)). This two-part inquiry must be performed separately from the determination regarding the severity of a claimant's impairments. See Babb v. Colvin, No. 13-CV-868, 2014 WL 4684883, at *4–5 (N.D.N.Y. Sept. 19, 2014) (finding that the ALJ erred in conducting an RFC determination without making any "express finding as to whether objective medical evidence establishe[d] impairments capable of causing the degree and type of pain alleged," even though the ALJ had, at step two, made findings regarding the severity of claimant's impairments). Failure to properly separate the step-two

severity analysis and the RFC determination constitutes reversible legal error. Tebidor v. Comm'r of Soc. Sec., No. 13-CV-104, 2016 WL 1448828, at *5 (N.D.N.Y. Apr. 12, 2016) (citing Meadows v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010)).

Here, while ALJ Wright correctly set out the two-part test described above, R. at 20–21, he failed to apply it to Hall's physical impairments and the pain allegedly resulting from those impairments. Instead, ALJ Wright limited himself to a discussion of Hall's anxiety and depression and the limitations on functioning they produced. Id. at 21–23. He found that Hall's mental impairments could reasonably be expected to produce the symptoms she alleged, in particular her inability to concentrate when depressed and her debilitating anxiety attacks. Id. at 21. He then stated that Hall's testimony about the limiting effects of these ailments was "not entirely credible for the reasons explained in this decision." Id. However, nowhere in this section of the decision did ALJ Wright consider whether Hall's physical impairments—for example, her extensively documented gastrointestinal issues, e.g., id. at 535—could be expected to produce the pain she alleged. While ALJ Wright did conclude that Hall's abdominal pain and reflux were "nonsevere" at step two, this cannot excuse the legal error he committed in the RFC determination in failing to explicitly consider whether Hall's physical impairments could reasonably lead to the symptoms she alleged. See Babb, 2014 WL 4684883, at *4–5.

ALJ Wright also failed to perform the second part of this inquiry. He never evaluated the nature of the pain Hall allegedly experienced due to her physical impairments in order to determine their effect on her functioning—an evaluation required by 20 C.F.R. § 404.1529(c). Again, while ALJ Wright did make credibility determinations at step two regarding limitations on functioning resulting from physical ailments, R. at 19, he failed to evaluate the symptoms

caused by these ailments in his RFC determination. Thus, ALJ Wright "failed to make either of the required findings in the two-step credibility analysis." <u>Clancy v. Astrue</u>, No. 06-CV-1486, 2009 WL 1457690, at *7 (N.D.N.Y. May 22, 2009) (Kahn, J.).

The mandate to separate the step-two severity inquiry from the RFC determination makes sense given the differences in the standards applicable to them. For example, in making the severity determination, the ALJ decides whether the claimant has an impairment that "significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). Under the regulations guiding the RFC inquiry, however, the ALJ determines whether the claimant has a medically determinable impairment that "could reasonably be expected to produce the pain or other symptoms alleged." <u>Id.</u> § 404.1529(b). The ALJ's findings with respect to one of these inquiries may have some relevance to the other inquiry. But because each is guided by a different goal—at step two, to determine the effect of the impairment on the ability to work, and, at the first step of the RFC stage, to evaluate the relationship between the impairment and the symptoms alleged—the overlap may not be complete.

Since ALJ Wright failed to apply the proper legal standards at this stage of the RFC determination, remand is appropriate. See <u>Stango v. Colvin</u>, No. 14-CV-1007, 2016 WL 3369612, at *9 (D. Conn. June 17, 2016) ("[A]n erroneous application of law cannot be overcome by a showing that the 'substantial evidence' standard has purportedly been met . . . ." (citing <u>Johnson</u>, 817 F.2d at 986)). Moreover, this is not a case in which "application of the correct legal principles to the record could lead to only one conclusion." <u>Johnson</u>, 817 F.2d at 986. For example, there is extensive evidence in the record of physical ailments endured by

Hall after her 2012 surgeries, u.g., R. at 523, and on remand the Commissioner might find that these ailments could lead to the pain Hall alleged at the hearing.

Accordingly, on remand, the Commissioner, in making the RFC determination, must apply the two-part test described above to Hall's physical impairments and the pain she allegedly experienced as a result of those impairments.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **VACATED and REMANDED** for further proceedings consistent with this Memorandum-Decision and Order; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:     November 29, 2016
           Albany, New York




                                        Lawrence E. Kahn
                                        U.S. District Judge